Maria **FERREIRA**, Petitioner,

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES (WORKERS' COMPENSATION), Respondent.**

**B & B Caterers, et al., Intervenors.**

**No. 85–1585.**

District of Columbia Court of Appeals.

Argued Feb. 5, 1987.
Decided Sept. 30, 1987.

---

Edward L. Norwind, with whom Lynn Suzanne Spradley, Washington, D.C., was on brief, for petitioner.

Russell E. Bond, with whom Denise Jakabcin Tassi, Washington, D.C., was on brief, for respondent-intervenors B & B Caterers and Firemans Fund Ins. Co.

Before MACK, NEWMAN and FERREN, Associate Judges.

MACK, Associate Judge:

By order dated October 29, 1985, the Department of Employment Services ("DOES") denied petitioner's claim for compensation under the District of Columbia Workers' Compensation Act. D.C.Code §§ 36–301 to –345 (1981 & 1987 Supp.) (the "Act"). DOES determined that petitioner failed to establish by credible evidence that a "specific traumatic injury" at B & B Caterers ("B & B") resulted in her severe cervical spine disability. Since the Act does not require proof of a "specific traumatic injury" as the basis for compensation and since DOES improperly disregarded the statutory presumption of causality, D.C.Code § 36–321 (1981), we reverse and remand.

I.

Petitioner enjoyed a reputation as a conscientious and cooperative worker for B & B Caterers where she was first employed as a waitress. Her duties included setting up tables and chairs for parties, serving as a waitress during functions, and cleaning up. In preparation for the functions, petitioner was also required to lift heavy chafing dishes, wood boxes, and glass punch bowls. In the summer of 1982, petitioner was promoted to assistant equipment manager. Petitioner's supervisor indicated that her promotion was in part motivated by his desire to enable her to direct other workers to help her lift heavy objects. Despite the promotion, petitioner was still compelled to lift objects "all the time."

In the fall of 1982, petitioner began experiencing pain in the right side of her neck, her right shoulder and arm. Petitioner's supervisor recalled that petitioner complained of discomfort in those areas sometime in the last quarter of 1982 or early 1983. After attempting to alleviate the pain through home remedies, petitioner went to a Doctor Ford on December 28, 1982. Doctor Ford's records indicate that petitioner pinpointed the start of the pain

at some two to three months before the December office visit.

Although petitioner was treated with anti-inflammatory agents, her condition continued to deteriorate. On February 21, 1983, petitioner terminated her employment at B & B, and was admitted to the Washington Adventist Hospital the following day. While in the hospital, petitioner's supervisor recommended that petitioner file a workers' compensation claim, recognizing the possible employment basis of petitioner's injuries. A myelogram and cervical laminectomy were subsequently performed by a Doctor Polanco. During surgery, a ruptured disc from petitioner's cervical spine was removed.

After recovery from the surgery, petitioner was employed as a security guard for Pinkerton Detective Service. Petitioner terminated her work with Pinkerton in April, 1984, after falling and injuring her knee. Throughout her year of employment with Pinkerton, petitioner was treated for spinal difficulties. At the time of her resignation from Pinkerton, she suffered persistent pain radiating from her neck to both shoulders and arms. Further surgery was performed in May and June, 1984, and petitioner was then diagnosed as having degenerative cervical and lumbar disk disease. Her physicians instructed her not to return to work.

Sometime in 1983, petitioner filed a claim with the Department of Employment Services alleging that she sustained a disabling injury caused by "a severe lifting requirement while performing as an assistant manager in the equipment department of B & B Caterers." Petitioner sought temporary total disability benefits for the period between February 21, 1983, and May 1, 1984, and permanent total disability benefits subsequent to May 1, 1984.

At the start of the July 10, 1985 hearing, the hearing examiner isolated five disputed issues. The first issue was "whether claimant suffered a work injury on October 28, 1982," and the fifth issue was "whether claimant suffered an accidental injury within the meaning of the Act." Petitioner testified that her neck injuries were precipitated by lifting a 70–80 pound chafing dish while working at B & B on October 28, 1982.[1] A fellow employee testified that petitioner never complained to him of any specific lifting episode resulting in her injuries. B & B's record keeper testified that petitioner filed no report of an injury in October or November of 1982.

In addition to that testimony, DOES had the benefit of hundreds of pages of documentary evidence from the numerous physicians who attended petitioner and from two consulting physicians hired by B & B's insurer. That evidence revealed that, in 1976, petitioner underwent neck surgery to alleviate lower back pain. In the two years that followed, petitioner was treated for further spinal difficulties. All four physicians who treated petitioner acknowledged that her past history of spinal impairment was a factor in her current disability. Nevertheless, all four indicated that heavy lifting at B & B at least aggravated the previous injury.[2] One of the physicians

---

**1.** A chafing dish is "a cooking utensil supplied with a source of heat ... and used to cook food at the table." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 369 (Unabridged, 1969). Petitioner's supervisor testified in a deposition that the "chafing dishes were made out of stainless steel or silver plated stainless steel. The largest of the chafers were, I'll say, two, two-and-a-half feet long by maybe 18 inches wide, and they would go into—they were stored and shipped in a wooden box that was large enough to carry that." They weighed "about 80 pounds at the heaviest."

**2.** In a letter dated March 6, 1984, Dr. Ford, the general practitioner who first treated petitioner, wrote:

This is an addendum to my letter of January 5, 1984. My dictation of that date failed to reflect my professional opinion that there was a cause-effect relationship between [the] incident related at work on or about November 1982. On 12/28/82 when seen in this office, the patient related a two to three month history of pain in the right shoulder which occurred subsequent to lifting a heavy object while working as Assistant Manager in the Equipment Department of B & B Caterers.

In a letter dated May 26, 1983, Dr. Polanco, the surgeon who removed petitioner's ruptured disc in 1983, wrote:

Mrs. Ferreira reports [that] the beginning of the right brachialgia [i.e., pain in the arm] follow[ed] a heavy lifting episode while she

hired by the insurer indicated that half of petitioner's disability could be attributed to the 1976 injury and half to the work at B & B.[3] A Dr. Feffer, who testified on behalf of the insurer at the hearing, gave his opinion that petitioner's condition was a gradual degenerative process and that the deterioration petitioner experienced was the natural result of the 1976 surgical intervention.

In its order, DOES discredited petitioner's testimony that a specific lifting incident occurred on October 28, 1982. DOES' analysis focused almost entirely on the discrepancies between the statements petitioner made at the hearing, and those she made in the months immediately following the onset of the pain, when she stated she could not remember the exact date or precise trauma resulting in the injury. Finding that petitioner failed to specify an employment-related basis other than a specific traumatic injury occurring on October 28, 1982, DOES denied petitioner's request for compensation.

## II.

The District of Columbia Workers' Compensation Act of 1979, like its 1928 predecessor, was enacted to provide a reasonably quick and efficient manner to compensate employees for disabilities resulting from employment-bred injuries.[4] Employees and employers were both thought to gain by a system in which common law tort remedies were discarded for assured compensation regardless of negligence or fault. While it can hardly be gainsaid that in this day and age of complex medical disorders and tremendous job mobility, the fair adjudication of claims is sometimes slow and technical, the smooth operation of the system can only be ensured by some procedural informality, an ad hoc consideration of each set of facts, and a strict attention to the focus of a workers' compensation inquiry. The decision on review here suffers from several fatal deficiencies.

---

was performing as an assistant manager in the equipment department of B & B Caterers. ... If this is the case, and I have no reason to doubt the veracity of Mrs. Ferreira, there appears to be a cause-effect relationship between the ruptured disc that she presented and the incident reported at work.

In a letter dated January 3, 1984, Dr. Palmer, another surgeon who treated petitioner and operated on her in June, 1984, wrote:

> In my opinion, Maria Ferreira has a 30% disability as a result of neck injuries sustained at her job as a caterer in 1982. The patient had a history of previous cervical disk disease which was treated surgically in the 1970's but her symptoms completely resolved prior to her job related injury in 1982.
>
> I feel that she is 100% disabled for her former occupation as a caterer which requires repetitive bending, lifting, and reaching which she, at the present time, cannot do.
>
> The patient's symptoms were aggravated by her automobile accident in May, 1983; but I feel that the majority of her pathology pre-existed this automobile accident and therefore, the majority of her disability is the result of her job related injury in 1982.

In a letter dated October 12, 1984, Dr. Fink, another surgeon who performed surgery on petitioner in June, 1984, wrote:

> [I]t is difficult to be entirely objective, or precise, in ascribing specific symptoms to specific injuries, without making some allowance for the effect of antecedent problems on subsequent events and injuries.
>
> With this in mind, I would say that Mrs. Ferreira's complaints referrable to the cervical spine and upper extremities all date from the injury of 1982 and resulted in the surgery performed by Doctor Polanco in 1983 and, eventually, in the surgical procedure performed by Doctor Palmer and myself in June, 1984.

3. Dr. Michael W. Dennis, after examining petitioner at the request of the insurer, wrote:

> I would feel that as far as the neck is concerned, the patient warrants no greater than a 20% permanent partial disability rating for the body as a whole. This 20% permanent partial disability rating would be apportioned as follows. 10% referrable to the previous work injury of 1976 with secondary surgery with 10% referrable to the most recent work injury. From the standpoint of the neck injury it is readily apparent that the patient had a significant pre-existing condition and that pre-existing condition materially and substantially worsened the patient's condition following the 1982 injury.

4. District of Columbia Workers' Compensation Act of 1979, D.C. Law 3-77, 27 D.C.Reg. 2503 (1980) (codified as amended at D.C.Code §§ 36-301 through -345 (1981 & 1987 Supp.)). District of Columbia Workmen's Compensation Act of 1928, 45 Stat. 600, ch. 612 (codified as amended at D.C.Code §§ 36-501 through -502) (1973)).

## A.

■ The first flaw in the decision on review is its failure to provide petitioner with the benefit of the statutory presumption of compensability. In this jurisdiction, there is a presumption that a "claim comes within the provisions of this [the Workers' Compensation] chapter." D.C.Code § 36–321(1) (1981); *Dunston v. District of Columbia Dep't of Employment Services,* 509 A.2d 109, 111 (D.C. 1986). This sound presumption, designed to effectuate the humanitarian purposes of the statute, reflects a "strong legislative policy favoring awards in arguable cases." *Wheatley v. Adler,* 132 U.S.App.D.C. 177, 183, 407 F.2d 307, 313 (1968) (en banc), *cited in Dunston, supra,* 509 A.2d at 111; *see Hensley v. Washington Metropolitan Area Transit Authority,* 210 U.S.App.D.C. 151, 154, 655 F.2d 264, 267 (1981) (the presumption is "but one indication of the 'humanitarian nature' of the Act generally"), *cert. denied,* 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982). The Act "is to be construed liberally for the benefit of employees and their dependents." *J.V. Vozzolo, Inc. v. Britton,* 126 U.S.App.D.C. 259, 262, 377 F.2d 144, 147 (1967); *see Champion v. S & M Traylor Bros.,* 223 U.S.App.D.C. 172, 174, 690 F.2d 285, 287 (1982) (Act is to be liberally construed in accordance with its purpose).

While the purpose and origin of the presumption make its scope somewhat obscure, some points are generally accepted. In order to benefit from the presumption, a claimant needs to make some "initial demonstration" of the employment-connection of the disability. 1 A. LARSON, WORKMEN'S COMPENSATION LAW § 10.33 at 3–138 (1986) (hereinafter "Larson"). The initial demonstration consists in providing some evidence of the existence of two "basic facts":

a death or disability and a work-related event, activity, or requirement which has the *potential* of resulting in or contributing to the death or disability. *See Naylor v. Grove Construction Company,* H & AS No. 83–163, DOES Final Order at 8 (DOES, August 1, 1984). The presumption then operates to establish a causal connection between the disability and the work-related event, activity, or requirement.[5] *Swinton v. J. Frank Kelly, Inc.,* 180 U.S.App.D.C. 216, 223, 554 F.2d 1075, 1082 (the "presumption applies as much to the nexus between an employee's malady and his employment activities as it does to any other aspect of a claim"), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976).

Once the presumption is triggered, the burden is upon the employer to bring forth "substantial evidence" showing that death or disability did not arise out of and in the course of employment. *Hensley, supra,* 210 U.S.App.D.C. at 154, 655 F.2d at 267; *Swinton, supra,* 180 U.S.App.D.C. at 222, 554 F.2d at 1081; *Wheatley, supra,* 132 U.S.App.D.C. at 182, 407 F.2d at 312; *Butler v. District Parking Management Co.,* 124 U.S.App.D.C. 195, 197, 363 F.2d 682, 684 (1966); *see Dunston, supra,* 509 A.2d at 111 (the "presumption requires the employer to take the initial steps to disprove liability"). "Stated otherwise, the statutory presumption may be dispelled by circumstantial evidence specific and comprehensive enough to sever the potential connection between a particular injury and a job-related event." *Swinton, supra,* 180 U.S.App.D.C. at 224, 554 F.2d at 1083, *quoted in Hensley, supra,* 210 U.S.App. D.C. at 155, 655 F.2d at 268.

In this case, petitioner provided more than enough evidence of the existence of the two basic facts necessary to trigger the presumption. First, petitioner indisputably

---

5. No harshness results from the proper application of this presumption. It must be remembered that the mere filing of a claim with the Department of Employment Services is insufficient to invoke the presumption. *See* 1 LARSON, *supra,* § 10.33 at 3–138; *Naylor, supra,* DOES Final Order at 6. For example, as Professor Larson so aptly illustrates, a claimant cannot simply state, " 'My husband, who was one of your employees, has died, and I therefore claim

death benefits.' " 1 LARSON, *supra,* § 10.33 at 3–138. Rather, the claimant must first provide some evidence of the employment connection of the disability before the burden of production is shifted to the employer on the question of employment connection.

Moreover, the presumption "has no application to a determination of the nature and extent of ... injury." *Dunston, supra,* 509 A.2d at 111.

suffered a severe disability. Second, the manifestation of petitioner's disability occurred in the course of her employment at B & B, and petitioner presented sufficient testimonial evidence of the lifting requirements of her work to generate a potential connection between the work-related activity and the disability. Thus, the burden shifted to B & B to disprove the employment connection.

In the decision on review, DOES neglected to apply or inadvertently misapplied the law on presumptions. In any event, it neither addressed nor considered the employer's responsibility for disproving employment causality.

### B.

█ The second flaw in the decision on review is its application of an inappropriate test for determining whether petitioner sustained a compensable disability. In rejecting petitioner's claim, the hearing examiner stated: "I conclude that there is no credible evidence of record upon which I can conclude that claimant suffered a specific traumatic injury." Since the Act does not require that a "specific traumatic injury" be the cause of a claimant's disability, the agency erred as a matter of law in rejecting petitioner's claim on that basis.

To qualify for benefits, a claimant must sustain an "accidental injury or death arising out of and in the course of employment." D.C.Code § 36–301(12) (1981). This jurisdiction has repeatedly rejected the notion that a "specific traumatic injury" is necessary to establish a prima facie case of an "accidental injury."

> [T]he statutory language "accidental injury" does not require that an unusual incident be the cause of the injury, but is satisfied if something unexpectedly goes wrong within the human frame.

*Washington Metropolitan Area Transit Authority v. District of Columbia Dep't of Employment Services,* 506 A.2d 1127, 1130 (D.C.1986), *quoted in Jones v. District of Columbia Dep't of Employment Services,* 519 A.2d 704, 708 (D.C.1987); *see Wheatley, supra,* 132 U.S.App.D.C. at 181 n. 6, 407 F.2d at 311 n. 6; *Hoage v. Royal*

*Indem. Co.,* 67 U.S.App.D.C. 142, 145, 90 F.2d 387, 390, *cert. denied,* 302 U.S. 736 (1987); *Commercial Casualty Ins. Co. v. Hoage,* 64 U.S.App.D.C. 158, 159, 75 F.2d 677, 678 (1935).

While the precise meaning of the "human frame" definition of "accidental injury" is undeniably elusive, it clearly encompasses two concepts. First, the nature of the activity or event which results in or contributes to the injury may occur in the "usual and ordinary" course of work. *Commercial Casualty Ins. Co., supra,* 64 U.S.App.D.C. at 159, 75 F.2d at 678, *quoted in Hancock v. Einbinder,* 114 U.S.App. D.C. 67, 71, 310 F.2d 872, 876 (1962). The work need not be unusual or unexpected; "[i]t is sufficient that the injury itself, the effect, be unexpected." *Trimmer v. A.G. Prada Co., Inc.,* H & AS No. 84–185, DOES Final Order at 4 (DOES, October 23, 1985).

Second, the nature of the potential cause of the disability need not be a discrete, particularized event. *See Vozzolo, supra,* 126 U.S.App.D.C. at 265, 377 F.2d at 150 ("the record does not isolate a specific event as the catalyst for the [coronary] infarction, but the argument on this score also seems to incorporate a misapprehension"); *Trimmer, supra,* DOES Final Order at 4 (no need to isolate "an unusual or unexpected external event, happening or circumstance as the cause of the injury"). Of course, the specification of a discrete work-related event causing the disability is sufficient to satisfy the causality requirement. *See, e.g., Howrey & Simon v. District of Columbia Dep't of Employment Services,* 531 A.2d 254 (D.C.1987) (accounting clerk totally disabled after tripping over a heavy box left on the office floor); *Washington Metropolitan Area Transit Authority v. District of Columbia Dep't of Employment Services, supra,* 506 A.2d 1127 (bus driver injured neck when he turned around to tell passengers not to smoke marijuana); *Commercial Casualty Ins. Co., supra,* 64 U.S.App.D.C. 158, 75 F.2d 677 (grocery store clerk died of heart attack after one evening of lifting heavy sacks of potatoes). Such specification,

however, is not necessary. It is sufficient to show that a work condition or activity which is gradual or progressive in nature potentially resulted in or contributed to the disability.

Numerous cases in this jurisdiction illustrate the principle that "repeated trauma" or "cumulative exposure" to conditions or activities which potentially result in or contribute to disability or death satisfy the causality requirement of "accidental injury." Thus, in *Hensley, supra,* repeated trauma to the hands, back, thighs, and feet of a WMATA bus driver aggravated, to the point of total disability, a pre-existing psoriasis condition, thus justifying an award of benefits. In like manner, nine months of employment-bred overwork, worry, and emotional strain, which resulted in a fatal heart attack, satisfied the employment connection requirement. *Hoage v. Royal Indem. Co., supra.* Furthermore, in *Butler, supra,* a denial of disability benefits was reversed despite the fact that the record showed no discrete event connecting the claimant's mental disorder to his work as a parking lot attendant. Finally, in *Vozzolo, supra,* even though a claimant's second on-the-job heart attack was not "brought on by some new job-connected occurrence," compensation was appropriate since the second infarction was an "added consequence" of the first employment-bred heart failure five years earlier. *Id.* 126 U.S.App. D.C. at 265, 377 F.2d at 150.

Other jurisdictions likewise reject the notion that a sudden, traumatic event is necessary to establish employment connection. *See Peoria County Belwood Nursing Home v. Industrial Comm'n of Ill.,* 138 Ill.App.3d 880, 883, 93 Ill.Dec. 689, 692, 487 N.E.2d 356, 359 (1985), *aff'd,* 115 Ill.2d 524, 106 Ill.Dec. 235, 505 N.E.2d 1026 (1987)

(carpal trauma syndrome is compensable disability since "[t]he risk of injury from repeated trauma and exposure ... must be recognized" and the "interpretation of 'accident' must be refined to reflect the purpose of the Act and the reality of employees obligated to perform repetitive tasks"); *Harper v. Kast Metals Corp.,* 397 So.2d 529 (La.App.1981), *writ denied,* 401 So.2d 988 (La.1981) (heavy lifting aggravating arthritis in wrists was accidental injury); *Sielicki v. New York Yankees,* 388 So.2d 25 (Fla.App.1980) (left arm disability resulting from repeated trauma of pitching professional baseball held compensable), *review denied,* 392 So.2d 1377 (Fla 1981); *Scanlan v. Bernard Lumber Co.,* 365 So.2d 39 (La.App.1978) (back problems resulting from cumulative effect of a series of lifting episodes held compensable); *Hoehne v. Granite Lumber Co.,* 189 Mont. 221, 615 P.2d 863 (1980) (disability resulting from continuous strain of lifting lumber held compensable); *see generally* 1B Larson, *supra,* § 39.40 (collected cases illustrating principle that injuries resulting from gradual and progressive causes are compensable). Thus, the agency's denial of petitioner's claim on the grounds that there was no credible evidence of a "specific traumatic injury" was erroneous as a matter of law.[6]

### C.

The final flaw in the DOES decision is its failure to consider alternative work-related causes of petitioner's disability after rejecting her contention that a specific lifting incident occurred on October 28, 1982. It is of course true that at the DOES hearing, petitioner's sole "theory of employment causation" was the occurrence of a specific lifting incident on October 28,

---

**6.** The Employee's Claim Application in the record before us, which DOES furnished to petitioner, perhaps contributes to the misapprehension that a particular incident must be isolated as the source of the disability. The claim form requires that the claimant state the "Date and Time of Injury." Obviously, for disabilities which gradually manifest themselves, *cf., Howrey & Simon, supra,* at 258 ("[a]ccidents which appear minor at the time they occur may result in greater injury than anticipated") or result

from repeated trauma or cumulative exposure to work-related activities, conditions, or requirements, it is often the case that no specific date and time of injury can be given. In such a case, claimants would behoove themselves to state a period of time during which the symptoms started manifesting themselves or the exposure or repeated trauma occurred. Clearly, a claimant may not be penalized for approximating a date when the form itself provides no alternative to a "single date and time theory" of injury.

1982, and, in its decision, DOES found that no such incident occurred on that date. But, while crediting petitioner's claim of an October 28, 1982 lifting incident certainly would have bolstered her allegation of the employment-basis of the disability, discrediting the claim hardly proved that the disability was not work-related.[7] *See U.S. Industries/ Federal Sheet Metal, Inc. v. Director, Office of Workers' Compensation Programs, United States Dep't of Labor,* 455 U.S. 608, 619, 102 S.Ct. 1312, 1319, 71 L.Ed.2d 495 (1982) (Brennan, J., dissenting). The informality and flexibility purposely animating the procedures governing workers' compensation claims and the agency's participatory role in the fair adjudication of these claims militate against the formalism DOES exhibited here.

### 1.

As Professor Larson notes:

The adjective law of workmen's compensation, like the substantive, takes its tone from the beneficent and remedial character of the legislation. Procedure is generally summary and informal.... The whole idea is to get away from the cumbersome procedures and technicalities of pleading, and to reach a right decision by the shortest and quickest possible route.

3 LARSON, *supra,* § 77A.10 at 15–1 to 15–2. At the initial claim stage, all a claimant need file is one written claim form with DOES. D.C.Code § 36–314 (1981). The "claim" amounts to nothing more than a simple request for compensation and DOES provides a form for making such a request. Informal procedures, such as informal conferences, written communication, and telephone contact, are utilized by DOES during the investigatory phase of the claim procedure for the efficient resolution of a controverted claim. 7 DCMR §§ 219.2, 219.3, 219.8 (1986). Moreover, if a hearing is

necessary, formal rules of evidence do not apply. Indeed, post-hearing procedures may be ordered if the hearing examiner determines that relevant evidence was not presented at the hearing. *Id.* § 223.4.

Complementing and facilitating the flexibility of the procedures is DOES' active role in claim adjudication. Thus, as indicated above, DOES provides a form for making a claim; formal complaints drafted by parties are not required. After a claim is filed, it is the duty of DOES to make "such investigations as [it] considers necessary in respect of the claim." D.C.Code § 36–320(c) (1981); *see* 7 DCMR § 219.7 (1986) ("[e]ach controverted claim ... shall be investigated by the Office [DOES]"). Moreover, DOES is empowered to "narrow issues, encourage voluntary payment of claims, and encourage agreement between interested parties." 7 DCMR § 211.2 (1986).

DOES' responsibilities continue through the hearing and post-hearing stages. The "[h]earing or [a]ttorney [e]xaminer *shall inquire fully* into matters at issue and shall receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters." *Id.* § 223.3 (emphasis added). Furthermore, a hearing examiner may determine, post-hearing, to reopen the hearing:

If the Hearing or Attorney Examiner believes that there is relevant and material evidence available which has not been presented at the hearing, the hearing may be adjourned or, at any time prior to filing of the compensation order, the hearing may be reopened for the receipt of the evidence.

*Id.* § 223.4. Thus, the procedures attendant upon the resolution of a workers' compensation claim are purposely designed to give DOES the flexibility to fairly and efficiently adjudicate a claim.

---

**7.** For example, if petitioner's disability was caused by a discrete lifting episode on an unspecified date in late October or November, or if the disability resulted from a series of lifting episodes over the course of petitioner's employment, petitioner's disability would clearly be employment-bred and compensation would be appropriate. Because the etiology of some disabilities is often difficult to pinpoint, and because the nature, severity, and extent of an injury may not be fully appreciated until sometime after the cause or gradual causes of the injury occur, in appropriate cases (such as this one), claimants are encouraged to argue "in the alternative" the possible theories of employment causation.

Given the flexibility and informality built into the pre-hearing, hearing, and post-hearing procedures, and the agency's active role in the adjudication of these claims, confining a claimant to one particular "theory of employment causation," or failing to consider other possible employment-related causes of a disability is antithetical to the statutory and regulatory scheme. Moreover, the beneficent purposes of the Act and its replacement of common law remedies constrain DOES to resolve, for every claim, the fundamental questions of whether there is a disability and whether it is employment-related.

In this case, there was a departure from attention to the basic issue: was petitioner's cervical spine disability caused or aggravated by her employment with B & B? *See U.S. Industries, supra,* 455 U.S. at 620, 102 S.Ct. at 1320 (Brennan, J., dissenting). Therefore, even if the hearing examiner discredited petitioner's claim that a specific lifting episode occurred on October 28, 1982, which caused or aggravated the disability, the hearing examiner was obligated to resolve the broader question of whether the disability was nonetheless employment-bred. If the issue was improperly narrowed pre-hearing, and if, as a result, the evidence at the hearing was insufficient to adjudicate the fundamental factual inquiry, the post-hearing procedures of 7 DCMR § 223.4 was available as relief.

The misfocus of the decision in this case can be appreciated by a summary of the strength of petitioner's prima facie showing of an employment-related injury. Thus, regardless of the exact date of the injury, petitioner was consistent in maintaining that the physical manifestations of her disability started in late October or early November while petitioner was in the sole employment of B & B. The lifting requirements of petitioner's job were severe enough that her supervisor promoted her in order to help alleviate some of the strain. After the severity of the injury became apparent, petitioner's supervisor recommended that she file a workers' compensation claim, and, in deposition testimony, he admitted that her disability may have been work-related. Finally, the four physicians who were primarily responsible for petitioner's treatment and one of the insurer's physicians indicated that lifting requirements on the B & B job at least potentially aggravated petitioner's disability.

With even less compelling evidence, the hearing examiner would have been required to apply the statutory presumption of compensability to this claim. Indeed, the inquiry in this case should have been focused on whether the employer provided "substantial evidence" of a nonemployment related basis to sever the potential employment connection petitioner manifestly proved.

### 2.

The intervenors argue, however, that a substantially similar question was presented in *U.S. Industries, supra,* with a result contrary to the one we reach today. In *U.S. Industries,* a claimant alleged that as a result of lifting 500 pounds of duct work on November 19, 1975, he was permanently disabled. The Administrative Law Judge ("ALJ") adjudicating the claim discredited the testimony and denied benefits. The United States Court of Appeals for the District of Columbia Circuit vacated the decision and the Supreme Court reversed. Interpreting the federal Longshoremen's and Harbor Workers' Compensation Act, ch. 509, 44 Stat. 1424 (1927) (codified as amended at 33 U.S.C. §§ 901–950 (1982)), the Supreme Court determined that the presumption of compensability in the federal act applied only to a "claim," and a "claim" referred to the specific theory of employment causation the claimant made. Since the ALJ rejected the claimant's one theory of causation, no presumption attached, and the claim was properly rejected.

■ Our interpretation of the meaning of "claim" under the District of Columbia Workers' Compensation Act differs from the Supreme Court's interpretation under the federal act. Under our Act, a "claim" means nothing more than a simple request for compensation which triggers the pro-

cess of claim adjudication.[8] A "claim" is not a specific theory of employment causation, and indeed, claimants are permitted to argue alternative theories of employment causation in making their "claim" for compensation. Under our Act, if one theory of employment causation has the potential to result in or contribute to the disability suffered, the presumption is triggered.

Intervenors do not, and indeed, could not argue that we are bound by the decision in *U.S. Industries.* *U.S. Industries* involved the interpretation of the federal Longshoremen's and Harbor Workers' Compensation Act, not the District of Columbia Workers' Compensation Act. The proper interpretation of the D.C. Act is a question of local law of which this court is the final expositer. D.C.Code § 11–102 (1981) ("[t]he highest court of the District of Columbia is the District of Columbia Court of Appeals"); *Gillis v. United States,* 400 A.2d 311, 313 (D.C.1979) (this court is "the final expositer of the local law of the District of Columbia") (citation omitted).[9]

### III.

We thus reverse and remand for further proceedings on the question of whether the employer can establish by substantial evidence the non-employment basis of petition-

er's disability. On remand, DOES should be mindful of this jurisdiction's "aggravation rule" of compensable accidental injuries. Thus "an aggravation of a preexisting condition may constitute a compensable accidental injury under the Act." *Wheatley, supra,* 132 U.S.App.D.C. at 182, 407 F.2d at 312. "The fact that other, nonemployment related factors may also have contributed to, or additionally aggravated [petitioner's] malady, does not affect [the] right to compensation under the 'aggravation rule.'" *Hensley, supra,* 210 U.S.App. D.C. at 155, 655 F.2d at 268. Employers must "accept with their employees the frailties that predispose them to bodily hurt," *Vozzolo, supra,* 126 U.S.App.D.C. at 262–63, 377 F.2d at 147–48, and if petitioner's disability "arose *even in part* 'out of and in the course of' [her] employment," compensation is appropriate. *Hensley, supra,* 210 U.S.App.D.C. at 155, 655 F.2d at 268 (emphasis in original) (citation omitted). DOES is recommended to the several cases in this jurisdiction which describe in more detail the specifics of this rule. *See Champion, supra* (pre-existing asthma); *Hensley, supra* (pre-existing psoriasis); *Wheatley, supra* (preexisting arteriosclerosis); *Vozzolo, supra* (pre-existing coronary arteriosclerosis).

---

**8.** Reference to the statutory language throughout the Act demonstrates the meaning of "claim." Thus, D.C.Code § 36–314, entitled "Time for filing claims," provides:

    (a) Except as otherwise provided in this section, the right to compensation for disability or death under this chapter shall be barred unless a *claim* therefor is filed within 1 year after the injury or death. If payment of compensation has been made without an award on account of such injury or death, a *claim* may be filed within 1 year after the date of the last payment. Such *claims* shall be filed with the Mayor. The time for filing a *claim* shall not begin to run until the employee or beneficiary is aware, or by the exercise of reasonable diligence should have been aware, of the relationship between the injury or death and the employment. Once a *claim* has been filed with the Mayor, no further written claims are necessary. [Emphasis added.]

    *See also* D.C.Code § 36–314(b) (1981); *id.* § 36–320 (entitled "Procedure in respect of claims").

**9.** *See also Holland v. Baltimore & Ohio R.R.,* 431 A.2d 597, 600–01 n. 6 (D.C.1981) (en banc) (this court's decisions on local law control federal

courts under the doctrine of *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (citation omitted)); *Reichman v. Franklin Simon Corp.,* 392 A.2d 9, 12 (D.C.1978) (under the Court Reorganization Act, "[t]he local courts were to be given powers analogous to those of state courts, with [this court] constituted as the final judicial authority in the jurisdiction on matters of local law") (footnote omitted); *Berger v. Bd. of Psychologist Examiners,* 313 A.2d 602, 606 (D.C. 1973) (designation of this court as the "highest court [of] the District of Columbia" gave it "final authority to interpret a D.C. enactment" (citation omitted)); *Brown v. United States,* 239 U.S.App.D.C. 345, 354–55, 742 F.2d 1498, 1507–08 (1984) (the District of Columbia Court of Appeals is the "final expositer of local law") (citation omitted), *cert. denied,* 471 U.S. 1073, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985); *Financial General Bankshares, Inc. v. Metzger,* 220 U.S.App.D.C. 219, 229 n. 16, 680 F.2d 768, 778 n. 16 (1982) (District of Columbia Court of Appeals is "the final arbiter of local law").

*Reversed and remanded for further proceedings consistent with this decision.*